UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BRIDGET L. SCOTT,

                Plaintiff,

   - against -

NORTHERN MANOR MULTICARE CENTER, INC.
d/b/a NORTHERN MANOR

                Defendant.
-------------------------------------------------------------------X

Index No. _____

**COMPLAINT**

**Jury Trial Demanded**

FILED
U.S. DISTRICT COUR
2015 APR -1 PM 3: 2
S.D. OF N.Y.W.P.

JUDGE KARAS

15 CV 2495

    Plaintiff BRIDGET L. SCOTT, by her attorneys Kitson & Schuyler P.C., for her complaint respectfully alleges:

## NATURE OF THE ACTION

    1.    This is an action for compensatory and punitive damages, proximately resulting from the Defendant's conduct, that violated Plaintiff's rights as guaranteed her by reason of Title VII, 42 U.S.C. §2000e *et seq.*, 42 U.S.C. § 1981, New York Exec. Law § 290 *et seq.*, New York State Labor Law § 741, and for tortious interference with prospective business relations.

## JURISDICTION AND VENUE

    2.    The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

    3.    On or about February 26, 2014, Plaintiff duly and timely filed with the United States Equal Employment Opportunity Commission a Charge of Discrimination on the basis of race discrimination. (Charge No. 520-2014-01083). On December 30, 2014, the EEOC issued Plaintiff a Notice of Right to Sue.

    4.    Venue is properly before this Court pursuant 28 U.S.C. § 1391(a) in that the Defendant is located in this district and the events giving rise to the claim occurred in this

district.

## THE PARTIES

5.     Plaintiff Bridget L. Scott is an African American female of legal age who resides within this judicial district.  At all times relevant to this Complaint, Plaintiff was employed as a licensed practical nurse at Defendant Northern Manor Multicare Center, Inc. ("Northern Manor").

6.     Upon information and belief, and at all times relevant hereto, Defendant Northern Manor is a domestic not-for-profit corporation duly organized and existing under and by virtue of the laws of the State of New York. Northern Manor is a skilled nursing and adult day healthcare facility, with a principal place of business located at 199 North Middletown Road, Nanuet, New York 10954.  Defendant Northern Manor is a covered employer under Title VII, 42 U.S.C. § 2000e.

## THE FACTS

7.     Plaintiff is a licensed practical nurse ("LPN") and was employed in such capacity at Defendant Northern Manor from 2007 until her termination on or about January 29, 2014. During the course of her employment with Northern Manor, plaintiff engaged in patient care while working on various care units at Northern Manor, including the Ventilator unit and the Rehab unit.  In her position as a LPN, Plaintiff performed health care services for Northern Manor's patients and was required to make judgments as to the quality of patient care based on her training and experience as a LPN.

8.     Throughout the course of her employment, plaintiff was treated differently from other similarly situated licensed practical nurses that were white.  For example, from July 2011 through October 2013, plaintiff was written up by her supervisors for various time clock

violations for which other white licensed practical nurses, such as Ann Hoffman and Winifred Saraceno, had not been disciplined for the very same violations.

9.      In March 2013, plaintiff was terminated from her employment.  However, in May 2013, pursuant to an agreement that settled a union grievance concerning the circumstances of her termination, plaintiff returned to her employment with Northern Manor under the terms of a "Last Chance Agreement."

10.      After returning to her employment at Northern Manor, plaintiff noted that the differential and discriminatory treatment that she had experienced was intensified.  Although plaintiff was given a regular floor assignment to which she was expected to report each working day, she was frequently detailed away from her regular assignment to work on either of Northern Manor's most challenging and acute patient care units, the Ventilator unit and the Rehab unit.  In the period after May 2013 until her termination, plaintiff was required to work on the Ventilator unit while other white licensed practical nurses, such as Maureen Dillon and Julia Alderson, were not required to work on this unit, despite having the same qualifications as the Plaintiff.

11.      During this same time period, plaintiff reported to the Assistant Director of Nursing Mr. James Oshie, RN that a patient on the Center-2 unit had requested that Maureen Dillon not be permitted to administer injections to her, because Ms. Dillon's hands shook due to tremoring episodes.  Plaintiff advised Mr. Oshie that the patient would permit Ms. Dillon to administer oral medications.  After making this confidential report, Ms. Dillon confronted plaintiff at the nurses' station and yelled at her, accusing plaintiff of spreading rumors about her.

12.      Upon information and belief, also during this same time period, Ann Hoffman, a white licensed practical nurse, was found to have made numerous medication and clinical mistakes in patient care, including administering a double dose of the drug Ativan to a patient on

the Center-2 Northside unit approximately 30 times. When Plaintiff discovered that Ms. Hoffman was overdosing the patient she reported this behavior to the assistant Director of Nursing. Plaintiff's report was made in good faith and based on her reasonable belief that a violation of New York Health Law and Regulations (e.g., NY CLS Pub Health Law § 2803-d, 10 NYCRR part 415) had been committed. Ms. Hoffman was not disciplined for this medical error.

13.     Also during the period between May 2013 and January 2014, plaintiff was inappropriately assigned by a white nursing supervisor, Margaret O'Connor, to irrigate a cholecystectomy tube of a post-operative patient. When plaintiff objected to this assignment, which she reasonably believed was out of the scope of practice of a licensed practical nurse, Ms. O'Connor threatened to "write her up." Thereafter the Plaintiff wrote to a contact on the New York State Board of Nursing for clarification regarding the appropriateness of this assignment, and was advised that such an assignment was inappropriate for a licensed practical nurse and could only be performed by a RN. When plaintiff showed Ms. O'Connor the response from the Board of Nursing indicating that she had been correct about the inappropriate nature of the assignment, Ms. O'Connor became infuriated and told plaintiff that she was "too political and involved in too many community affairs," and that she (Ms. O'Connor) felt that she "should have put you and Dee (another African-American nurse) on the Ventilator unit more but you people are always giving me a hard time." By community affairs, Plaintiff believes Ms. O'Connor was referring to Plaintiff's involvement in the Congressional Black Caucus and local NAACP chapter, which her supervisors had knowledge of because Plaintiff requested vacation time to participate in these activities. To plaintiff, Ms. O'Connor's comment smacked of racial animus and a desire and design to assign African-American nurses to the most challenging care units more often than other similarly situated white nurses.

4

14.     On another occasion, Plaintiff reported to Ms. O'Connor that a white nurse, Amanda Carelli, had left a female African-American patient in her wheelchair overnight and was found by Plaintiff Saturday morning sitting in feces. Plaintiff expected that the report of patient abuse would be investigated by Northern Manor. Plaintiff's report was made in good faith and based on her reasonable belief that a violation of New York Health Law and Regulations (e.g., NY CLS Pub Health Law § 2803-d, 10 NYCRR part 415) had been committed. Upon information and belief, the white nurse who had committed this act of patient abuse was not disciplined and no report was made to the New York Department of Health.

15.     Also during the period between May 2013 and January 2014, plaintiff repeatedly reported that another white nurse, Karen Schaeffer, was treating patients while inebriated. Plaintiff had observed Ms. Schaeffer's condition while working on the North/Northwest 2 unit. Plaintiff also reported that she reasonably believed Ms. Schaeffer was stealing and abusing narcotics while treating patients, based on an incident wherein a patient's narcotic medication went missing on a day when Ms. Schaeffer was working on the unit.  Plaintiff made such reports due to her concern for the safety and health of patients to both Margaret O'Connor, the RN Supervisor and Mirella Fiendian, a nurse manager.  Plaintiff's report was made in good faith and based on her reasonable belief that a violation of New York Health Law and Regulations (e.g., NY CLS Pub Health Law § 2803-d, 10 NYCRR part 415) had been committed. Upon information and belief, neither Ms. O'Connor nor Ms. Fiendian investigated these incidents or reported them to the New York State Department of Health.

16.     On another occasion, Plaintiff was assigned to white nurse manager Pat Ball's unit. Plaintiff noted that a medication cart was coated with a black and green substance that looked like mold and the handles on the drawers and inside the drawers were coated with an

unknown sticky brown substance. When Ms. Ball found out that Plaintiff had gone to housekeeping to obtain cleaning supplies to sanitize the medication cart, Ms. Ball became infuriated and reported plaintiff to the nursing supervisor.

17.     On another occasion, plaintiff was assigned to the Ventilator unit after Julia Alderson, a white licensed practical nurse, complained that the Ventilator unit was "too hard" for her.  Ms. Alderson was then detailed to the North/Northwest-1 unit, while plaintiff was required to work on the Ventilator unit in Ms. Alderson's place.  Additionally, Plaintiff's requests for overtime where routinely denied, but when Ms. Alderson requested overtime, her request was granted.

18.     Between May 2013 and January 2014, Plaintiff noticed that her Vacation and Sick Time were not being appropriately calculated after her work schedule had changed from a 4-day week to a 5-day week. Plaintiff complained to Northern Manor that not only was her accruals incorrect, but she also was not paid for her residual vacation and sick time.  Northern Manor ignored her complaints.

19.     On January 29, 2014, plaintiff reported to work, although she was feeling ill from the effects of having run out of blood pressure medication the day before. By the time she arrived at work she had a bad headache and felt that her blood pressure was elevated.  She went to her assigned unit, but immediately called nursing supervisor Pat Ball to inform her that she needed to leave work to see her doctor. While on the phone she was approached by Maureen Dillon who told her she had been reassigned to the Ventilator unit.  The patients on the Ventilator unit almost uniformly were on ventilators and required closer supervision and monitoring than the patients on her regular floor. The Plaintiff had worked on the Ventilator unit many times before and was aware that more vigilance and attention to detail and the possible expenditure of extra energy and

6

physical effort would be needed if she worked on this unit.

20.     Plaintiff was told by the supervisor on the phone that she was expected to report to the Ventilator unit that day but was not told that she would be disciplined or terminated for leaving work. On her way out of the facility, plaintiff encountered another nurse manager, Mirella Fiendian, who also advised that plaintiff was assigned to work on the Ventilator unit that day. Plaintiff again explained that she was leaving due to illness and would present a doctor's note. Plaintiff was not advised by this second nurse manager that any discipline would result from her leaving.

21.     Upon leaving Northern Manor, plaintiff went to her doctor's office, who prescribed rest until January 31, 2014, and provided plaintiff with a note to such effect. Plaintiff then returned home where she received a call from the scheduling coordinator at Northern Manor, Diane Ruppert, who advised that she had been terminated. Plaintiff thereafter provided her doctor's note to Northern Manor, but the decision to terminate plaintiff remained unchanged. On February 7, 2014, Plaintiff was finally provided a letter from Akiva Fogel, the Defendant's administrator, advising her in writing that she had been she had been "terminated from her position as a LPN at Northern Manor." No reason was provided for the termination. Upon information and belief, other similarly situated white nurses were not disciplined or terminated for leaving work due to medical necessity, or for asking not to work on the Ventilator unit.

22.     Upon information and belief, Northern Manor continued to discriminate and retaliate against plaintiff by tortiously interfering with plaintiff's efforts to obtain subsequent employment. Specifically, on or about May 27, 2014, plaintiff was hired as a part-time licensed practical nurse by Hebrew Hospital Home of Westchester in Valhalla, New York. After approximately two months she was offered a full-time position, starting July 27, 2014. Upon

information and belief, after being contacted by Northern Manor, the Hebrew Hospital Home of Westchester immediately terminated plaintiff's employment and she was discharged July 29, 2014.

23.     Plaintiff was next hired as a LPN at Mt. Sinai Hospital in New York City on or about December 8, 2014. Upon information and belief, after being contacted by Northern Manor, Mt. Sinai Hospital immediately terminated plaintiff's employment.

24.     As a direct and proximate result of said acts, Plaintiff has suffered and continues to suffer damages including, but not limited to, lost wages, pain and suffering, humiliation, damage to her professional reputation, mental anguish and emotional distress. In addition, due to the wrongful and retaliatory actions of Defendant, plaintiff has been terminated by subsequent employers, and lost two additional positions, resulting in additional damages.

## AS AND FOR A FIRST CLAIM

25.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 20 as if fully set forth herein.

26.     Under the premises Defendant's conduct violated Plaintiff's right to be free from discrimination motivated by her race as guaranteed by Title VII, 42 U.S.C. § 2000e, et seq.

## AS AND FOR A SECOND CLAIM

27.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22 as if fully set forth herein.

28.     Under the premises Defendants' conduct deprived Plaintiff of her rights under 42 U.S.C. § 1981.

## AS AND FOR A THIRD CLAIM

29.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 24 as if fully set forth herein.

30.    Under the premises Defendant's conduct deprived Plaintiff of her rights under New York State Executive Law § 290 et. seq.

## AS AND FOR A FOURTH CLAIM

31.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 26 as if fully set forth herein.

32.    Plaintiff, an employee of defendant Northern Manor, disclosed to a supervisor practices of Northern Manor which she reasonably believed posed a substantial and specific danger to public health or safety and significant threat to the health of several patients, namely those patients cared for by white nurses Maureen Dillon, Karen Schaeffer, Ann Hoffman, and Amanda Carelli, which constituted improper quality of patient care within the meaning of New York Labor Law § 741.

33.    When Plaintiff contacted the State Board of Nursing to get its opinion whether an assignment she was given by Margaret O'Connor to irrigate a cholecystectomy tube of a post-operative patient, was outside the scope of services a LPN was authorized to perform, Ms. O'Conner said she thought the Plaintiff should spend more time on the Ventilator unit.

34.    In retaliation for Plaintiff's disclosures, Northern Manor retaliated against plaintiff by subjecting her to differential work assignments, incorrectly calculating vacation and sick time earned by plaintiff, and eventually terminating plaintiff's employment in violation of New York Labor Law § 741.

## AS AND FOR A FIFTH CLAIM

35.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 29 as if fully set forth herein.

36.    Plaintiff was offered per diem employment as a licensed practical nurse in May

2014 at the Hebrew Hospital Home of Westchester ("Hebrew Hospital") and was then hired as a full-time employee by Hebrew Hospital on July 27, 2014.

37.    Hebrew Home is located at 61 Grasslands Road, Valhalla, NY 10595.

38.    Northern Manor had knowledge of plaintiff's offer of employment and upon information and belief, intentionally and improperly interfered with plaintiff's obtaining such employment by falsely advising the Hebrew Hospital Home of Westchester of alleged wrongdoing committed by plaintiff while employed at Northern Manor, resulting in the loss of plaintiff's employment on or about, July 29, 2014.

39.    Plaintiff was hired by Mt Sinai Hospital as a licensed practical nurse on or about December 8, 2014.

40.    Mt. Sinai Hospital is located at One Gustave L. Levy Place, New York, NY 10029.

41.    Northern Manor had knowledge of plaintiff's offer of employment and upon information and belief, intentionally and improperly interfered with plaintiff's obtaining such employment by falsely advising the Mt. Sinai Hospital of alleged wrongdoing committed by plaintiff while employed at Northern Manor, resulting in the loss of plaintiff's employment on, or about, December 22, 2014.

42.    As a result of Northern Manor's intentional interference with plaintiff's prospective employment relationships, plaintiff was damaged in an amount to be determined at trial.

## JURY DEMAND

Plaintiff demands trial by jury on all issues as of right by a jury.

WHEREFORE a judgment is respectfully demanded:

a.     Awarding Plaintiff such compensatory damages as the jury may determine;

b.     Awarding Plaintiff such punitive damages as the jury may determine;

c.     Awarding Plaintiff reasonable costs, disbursements and attorney's fees; and

d.     Granting such other and further relief as to the Court seems just and proper.

Dated: Croton on Hudson, New York
      April 1, 2015

Respectfully submitted,

**KITSON & SCHUYLER P.C.**

By:_____
    Roseann Schuyler (RS 0113)
    *Attorneys for Plaintiff*
    321 South Riverside Avenue
    Croton on Hudson, New York 10520
    (914) 862-0999