UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
BRIDGET L. SCOTT,

                   Plaintiff,                       **OPINION AND ORDER**

      -against-                          15 Civ. 2495 (JCM)

NORTHERN MANOR MULTICARE
CENTER, INC. d/b/a NORTHERN
MANOR,

                   Defendant.
------------------------------------------------------X

      Plaintiff Bridget L. Scott ("Plaintiff") commenced this action pursuant to: (i) Title VII of

the Civil Rights Act of 1964 (42 U.S.C. § 2000e) ("Title VII"); (ii) 42 U.S.C. § 1981 ("§ 1981");

(iii) New York State Executive Law § 290 (the "New York State Human Rights Law" or

"NYSHRL"); and (iv) New York Labor Law § 741 ("NYLL § 741" or "Section 741"),[1] alleging

that Defendant Northern Manor Multicare Center, Inc. ("Northern Manor" or "Defendant")

discriminated against her on the basis of her race and retaliated against her for whistleblowing.

(Docket No. 1).  Presently before this Court is Defendant's motion for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] (Docket No. 24).  Plaintiff opposes

the motion.[3] (Docket No. 35).  For the reasons that follow, Defendant's motion is granted.

---

[1] Though Plaintiff's Complaint also includes a claim against Defendant for tortious interference with her subsequent employment relationships, (*see* Docket No. 1 at ¶¶ 35–42), Plaintiff formally withdrew this claim during a status conference before the Honorable Paul E. Davison, U.S.M.J., on January 4, 2017. (Docket No. 25 at ¶ 10).

[2] The parties consented to jurisdiction by a United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c). (Docket No. 14).  The action was subsequently reassigned as of March 10, 2017, (*see* March 10, 2017 Docket Entry), and the undersigned adopted the summary judgment briefing schedule set by the Honorable Paul E. Davison. (Docket No. 23).

[3] The parties' briefs and supporting papers are hereinafter referred to as "Def. Br.," "Pl. Opp.," and "Def. Reply," respectively. (Docket Nos. 26, 35, 36).  All page number citations refer to the page number assigned upon electronic filing.

# I. BACKGROUND

The following facts are gathered from each party's statement filed pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 56.1"),[4] each party's supporting affidavits and exhibits, and the pleadings submitted by the parties in support of their contentions.

## A. The Parties

Plaintiff, an African-American licensed practical nurse ("LPN"), worked for Northern Manor, a residential healthcare facility, from 2003 until 2006. (Docket No. 1 at ¶ 5; Scott Aff.[5] at ¶ 3). Plaintiff returned to work at Northern Manor in 2007 and remained employed there until she was terminated on January 29, 2014. (Scott Aff. at ¶ 3). As an LPN, Plaintiff was responsible for "administering medications to residents, overseeing the work assignments of certified nursing assistants ('CNA'), wound treatment and inputting resident health and treatment information on medical charts." (Def. Statement at ¶ 19; Pl. Counterstatement at ¶ 19). From 2007 until August 14, 2013, Plaintiff worked on a part time basis as a "floater." (Def. Statement at ¶ 22; Scott Aff. at ¶ 6). As a floater, Plaintiff was assigned to various units based on the needs of the facility. (Def. Statement at ¶ 23; Pl. Counterstatement at ¶ 23). The majority of Northern

---

[4] The parties' Rule 56.1 statements are hereinafter referred to as "Def. Statement," and "Pl. Counterstatement," respectively. (Docket Nos. 25, 34). Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and denied by only a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court deems such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted . . ."); S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Plaintiff's Counterstatement marks certain statements as "disputed" but does not identify any actual factual inconsistency. Where these counterstatements do not identify a true factual dispute, the Court treats the statement as undisputed. *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 408 n.1 (S.D.N.Y. 2017).

[5] Refers to the affidavit of Plaintiff Bridget L. Scott. (Docket No. 30).

Manor residents live in continuous care units. (Scott Aff. at ¶ 5). Of these, the Rehabilitation and Ventilator Units require the most intensive care. (*Id.*; Def. Statement at ¶¶ 28, 37).

Defendant has served the senior community in Nanuet, New York since 1981. (Fogel Aff.[6] at ¶ 2). At all relevant times, Northern Manor was a party to a collective bargaining agreement ("CBA") with 1199 SEIU, Health Care Workers East ("the Union"). (Def. Statement at ¶ 13; Pl. Counterstatement at ¶ 13). Because Plaintiff was a member of the Union, the terms and conditions of her employment were governed by the CBA. (Def. Statement at ¶¶ 14–17; Pl. Counterstatement at ¶¶ 14–17). Under the CBA, Northern Manor had "the right to discharge, suspend, or discipline any employee for cause." (Docket No. 28-5 at 37).

## B. Plaintiff's First Termination

On September 2, 2012, Plaintiff was assigned to cover the Ventilator Unit.[7] (Docket No. 28-7 at 2). Plaintiff punched in for work at 7:30 a.m., but left early and provided Northern Manor with a note from her doctor. (*Id.* at 2–3). Defendant alleges that Plaintiff left after she was advised of her assignment to the Ventilator Unit. (Def. Statement at ¶ 40). Plaintiff contends, however, that she left work for medical reasons.[8] (Scott. Aff. at ¶¶ 22–23). Because Plaintiff provided Northern Manor with a doctor's note, (Docket No. 28-7 at 3), she was not disciplined for her conduct on that day. (Scott Aff. at ¶ 23).

---

[6] Refers to the affidavit of Akiva Fogel. (Docket No. 27).

[7] Plaintiff disputes this fact because Defendant has not attached the September 2, 2012 "assignment sheet" as an exhibit. (Pl. Counterstatement at ¶ 39). However, Defendant's Exhibit F makes clear that at minimum, Plaintiff's supervisor believed that Plaintiff was assigned to the Ventilator Unit on that date. (Docket No. 28-7) ("Bridget left the job on the vent unit early on 9/2 @8:10 according to the supervisor."). Because Plaintiff fails to cite to conflicting testimonial or documentary evidence, this fact is not found to be in dispute for purposes of this motion.

[8] Northern Manor's general practice is that an employee can leave work if he or she is not feeling well without facing adverse consequences, so long as he or she provides Northern Manor with a doctor's note upon his or her return. (Docket No. 29-2 at 3).

On March 17, 2013, Plaintiff was reassigned to the Ventilator Unit, (*see* Docket No. 29-3), but Plaintiff's supervisor reported that Plaintiff refused to work on the Ventilator Unit that day, (Docket No. 28-8). Plaintiff's "Employee Disciplinary Notice" dated March 18, 2013 indicates that she was suspended for her refusal and warned that the next incident would result in termination. (*Id.*). Plaintiff disputes refusing to work on the Ventilator Unit on that date and does not recall receiving the March 18, 2013 Employee Disciplinary Notice.[9] (Scott. Aff. at ¶ 25).

On March 18, 2013, Plaintiff met with Northern Manor's Administrator, Akiva Fogel ("Fogel"). (Docket No. 28-9; Scott Aff. at ¶ 25). According to Plaintiff, Fogel "refused to hear [her] version of what occurred and became very agitated and hostile to the point that [she] felt [she] should leave the room." (Scott Aff. at ¶ 25). Plaintiff maintains that Fogel chased her out of his office. (*Id.*; Docket No. 29-1 at 4). Upon leaving Fogel's office, Plaintiff said, "If you are looking for trouble, I will give you trouble."[10] (Docket No. 28-9). Plaintiff's Employee Disciplinary Notice relating to her meeting with Fogel indicates that she "refused to sign." (Docket No. 28-9). Plaintiff maintains, however that she never received this Employee Disciplinary Notice. (Scott Aff. at ¶ 25).

As a result of this incident, Plaintiff was terminated. (Docket No. 28-9). Plaintiff's Union grieved her termination and the grievance was settled pursuant to the Last Chance Agreement

---

[9] Plaintiff's Counterstatement indicates that Plaintiff left the Ventilator Unit on March 17, 2013 after calling in sick. (Pl. Counterstatement at ¶ 43). However, Plaintiff provides no support for this statement. In Plaintiff's affidavit, she lists four dates on which she allegedly refused to work the Ventilator Unit: September 2, 2012, March 17, 2013, October 22, 2013, and January 29, 2014. (Scott Aff. at ¶ 21). She further states that on *three* of these days she called out sick and provided a doctor's note. (*Id.* at ¶ 22). Plaintiff explicitly states that she called out sick and provided a doctor's note for September 2, 2012, (*id.* at ¶ 23), October 22, 2013, (*id.* at ¶ 27), and January 29, 2014, (*id.* at ¶ 28). Plaintiff's affidavit makes no reference to calling out sick on March 17, 2013. Nor has Plaintiff provided or referenced a doctor's note for that date. As such, the Court finds it undisputed for purposes of this motion that Plaintiff did not call out sick on March 17, 2013.

[10] Northern Manor's receptionist confirmed that she overheard Plaintiff make this remark on March 18, 2013 after leaving Fogel's office. (Docket No. 28-9 at 3). Though Plaintiff does not specifically recall what she said, she does recall being "very upset." (Scott Aff. at ¶ 25).

(the "Agreement" or "LCA") dated May 15, 2013. (Scott Aff. at ¶ 25; Docket No. 28-10). The

Agreement states:

> Bridget Scott acknowledges that should she in the future commit any infraction
> similar to which she was discharged for committing, including but not limited to:
> failure to accept an assignment and insubordination it shall be grounds for
> discharge. Any grievance or arbitration contesting such discharge shall be limited
> to the question of whether Bridget Scott committed the infraction(s) as charged; if
> it is proven that the infraction was committed, the penalty of discharge shall not be
> set aside.

(Docket No. 28-10). As Plaintiff notes, the Agreement does not contain a determination

or admission of guilt. (Pl. Counterstatement at ¶ 52). However, the LCA states that the

"time between discharge and reinstatement shall be deemed disciplinary suspension

without pay." (Docket No. 28-10).

## C. Plaintiff's Return to Northern Manor

Pursuant to the Agreement, Plaintiff returned to work at Northern Manor on or

about May 20, 2013. (Def. Statement at ¶ 53; Pl. Counterstatement at ¶ 53). Effective

August 4, 2013, Plaintiff became a full time employee and was "assigned to a unit on a

regular basis."[11] (Scott. Aff. at ¶ 7; Docket No. 28-11). On October 22, 2013, Plaintiff

was initially assigned to cover "House" and was subsequently reassigned to "Center-3."[12]

---

[11] After working at Northern Manor for a period of time, an LPN may be assigned to a particular unit. (Def.
Statement at ¶ 27; Scott Aff. at ¶ 6). Defendant maintains that work assignments at Northern Manor are never
"permanent" because reassignment may be necessary based on the facility's needs. (Def. Reply at 9). Plaintiff's
Affidavit and Opposition state that LPNs "generally" do not float to other units after they receive a "regular"
assignment, (Pl. Opp. at 5), *unless the needs of the facility require a change in assignment*, a 'reassignment.'" (Scott
Aff. at ¶ 6) (emphasis added). The Court does not find this raises a genuine issue of fact because Plaintiff
acknowledges that reassignments may occur. Plaintiff's deposition testimony is consistent. (Docket No. 29-1 at 1
("[Reassignment] *normally* didn't happen[.]") (emphasis added); *Id.* at 20 ("*Generally* you're not assigned to any
other unit[.]") (emphasis added)). Moreover, the evidence shows that LPNs with regular assignments were asked to
work on other units. (Docket Nos. 28-21, 28-22 at 2). For example, Caucasian LPN Katherine Morris had a regular
assignment, (*see* Scott Aff. at ¶ 16), but was reassigned to the Rehabilitation Unit during the relevant period,
(Docket No. 28-22 at 2).

[12] Defendant alleges that Plaintiff was assigned to the Ventilator Unit on October 22, 2013. (Def. Statement at ¶ 77).
However, both the cited support for this assertion and the daily assignment sheet indicate that Plaintiff was
reassigned to Center-3. (Docket No. 28-12; Docket No. 28-19 at 3). It is unclear whether Center-3 is also a
Ventilator Unit, but the Court finds that this detail is immaterial.

(Docket No. 28-19 at 3). Plaintiff punched in for work at 7:24 a.m. and punched out for work at 7:30 a.m. (Docket No. 28-12). According to Defendant, when Plaintiff became aware of her reassignment, she stated that she had an "extreme headache" and could not work her shift. (Def. Statement at ¶ 80; Docket No. 28-12). Plaintiff provided Defendant with a doctor's note and no adverse action or discipline was taken. (Docket No. 28-12; Scott Aff. at ¶ 27). Plaintiff maintains that she left work because she was sick. (Scott Aff. at ¶ 27).

Following her return to Northern Manor after signing the LCA, Plaintiff registered various complaints with her supervisors on separate occasions:

1) Plaintiff told the Assistant Director of Nursing, James Oshie ("Oshie"), that a patient requested that LPN Maureen Dillon not be permitted to administer injections because of her shaky hands. (Docket No. 28-24 at 18–19).

2) Plaintiff told Oshie that LPN Ann Hoffman made numerous mistakes in patient care, including inappropriately administering a double dose of Ativan to a patient on approximately thirty different occasions. (*Id.* at 20–22; Def. Statement at ¶ 57; Pl. Counterstatement at ¶ 57).

3) Plaintiff objected to being assigned to irrigate a cholecystectomy tube of a post-operative patient because she lacked experience. (Docket No. 28-24 at 22–23). Plaintiff then made a general inquiry to the New York State Board of Nursing as to whether an LPN was qualified to irrigate a cholecystectomy tube. (*Id.* at 23). Plaintiff did not report the incident to the Union. (*Id.* at 27–28).

4) Plaintiff told Margaret O'Connor, her supervisor at the time, that LPN Amanda Carelli left a patient in a wheelchair overnight and the patient was found sitting in feces the next morning. (Docket No. 28-24 at 28–29).

5) Plaintiff repeatedly reported that LPN Karen Schaeffer was treating patients while inebriated and told her supervisor that Schaeffer may have stolen narcotics while treating patients. (*Id.* at 32–33). Plaintiff never witnessed Shaeffer drinking alcohol or stealing, however. (*Id.* at 33).

6) Plaintiff noticed that a medication cart was coated with a black and green mold-like substance and that its handles and drawers were coated with an unknown sticky brown substance. (*Id.* at 35–36). She asked the "housekeeper" to clean it, but he refused and instead gave her the cleaning supplies. (*Id.*). Plaintiff then

cleaned the cart herself and reported the issue to Oshie and Elizabeth Gerosa, the Director of Nursing. (*Id.*).

No adverse action was taken against Plaintiff in response to any of the above complaints. (Def. Statement at ¶¶ 56, 58, 66, 68, 71, 75; Pl. Counterstatement at ¶¶ 56, 58, 66, 68, 71, 75).

**D. Plaintiff's Second Termination**

On January 29, 2014, Plaintiff punched in for work between 7:12 and 7:15 a.m. (Def. Statement at ¶ 84; Pl. Counterstatement at ¶ 84). She was initially assigned to "Center-2-South," but was subsequently reassigned to the Ventilator Unit. (Docket No. 28-20 at 42). Plaintiff telephoned her supervising RN, Pat Ball, after arriving at work to discuss how she was feeling that day. (Scott Aff. at ¶ 28; Docket No. 28-14 at 5). Plaintiff told Ball that she was sick and could not work the Ventilator Unit. (Scott Aff. at ¶ 28; Docket No. 28-14 at 5). Plaintiff also told Ball that it had been a long time since she had covered the Ventilator Unit, and therefore, she needed a refresher before working that unit again. (Scott Aff. at ¶ 28; Docket No. 28-14 at 5). Plaintiff had last worked on the Ventilator Unit on November 1, 2013. (Def. Statement at ¶ 92; Pl. Counterstatement at ¶ 92). Ball advised Plaintiff that she was required to work the Ventilator Unit as per the schedule, but Plaintiff told Ball that she was going to leave and go to the doctor. (Scott Aff. at ¶ 28; Docket No. 28-14 at 5). Plaintiff raised her voice and became argumentative, (Docket No. 28-14 at 3), and told Ball that she would not float to the Ventilator Unit, (Def. Statement at ¶ 90; Pl. Counterstatement at ¶ 90). Plaintiff then left the facility and went to the doctor. (Scott Aff. at ¶ 28). She does not recall whether she punched out before leaving Northern Manor. (Def. Statement at ¶ 95; Pl. Counterstatement at ¶ 95).

Later that day, Plaintiff was terminated because she "refused once again to go to [the Ventilator Unit] as instructed." (Docket No. 28-14 at 2). Plaintiff maintains that she left because

she was sick and therefore did not violate the Last Chance Agreement. (Scott Aff. at ¶¶ 28–29). The Union advised Plaintiff that she should be reinstated if she produced a doctor's note. (Docket No. 29-1 at 24).  Plaintiff produced a doctor's note, but Northern Manor did not reconsider her termination. (Scott Aff. at ¶¶ 28–29).  Plaintiff ultimately decided not to grieve or arbitrate her termination because she felt that she was being discriminated against. (Docket No. 29-1 at 27–28).

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the burden of demonstrating that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986).  "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583(LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (internal quotation marks omitted).

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).  That said, the Court may not weigh the evidence or

determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial[.]" *Anderson*, 477 U.S. at 250.

The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). If the moving party meets this initial burden, the burden then shifts to the non-moving party to "present evidence sufficient to satisfy every element of the claim." *Id.* "The non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,'" *id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 249–50), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-moving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

In the Southern District of New York, parties moving for and opposing summary judgment must also submit short and concise statements of facts, supported by evidence that would be admissible at trial. Local Civ. R. 56.1. The opposing party must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). However, uncontested facts cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement; the Court is free to disregard the assertion in the absence of citations or where the cited materials do not support the factual assertions in the

statements. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). The Court therefore has discretion "to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Id.* (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3). Nevertheless, the Court is "not required to consider what the parties fail to point out." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (internal quotation marks omitted).

## III. DISCUSSION

Plaintiff alleges that Northern Manor engaged in discriminatory conduct against her in violation of Title VII, 42 U.S.C. § 1981, and the New York State Human Rights Law by: (1) assigning her to work on Northern Manor's Ventilator and Rehabilitation Units; (2) failing to properly pay her for accrued vacation and sick time; (3) denying her overtime hours; and (4) terminating her on January 29, 2014. (Docket No. 1 at ¶¶ 10, 17–34). Plaintiff further alleges that the above actions also constitute retaliation in violation of NYLL § 741. (*Id.* at ¶¶ 10-17). Defendant argues that Plaintiff's Complaint should be dismissed in its entirety as there are no material facts in dispute and Plaintiff's claims fail as a matter of law. (Def. Br. at 2–7). Plaintiff also seeks, for the first time in her Opposition, to assert a claim under New York Labor Law relating to her vacation benefits and right to work overtime hours. For the reasons that follow, all of Plaintiff's claims are dismissed.

### A. Discrimination in Violation of Title VII, § 1981, and the NYSHRL

Discrimination claims brought under Title VII, § 1981, and the New York State Human Rights Law are all analyzed under the burden-shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ruiz v. Cty. Of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010); *Holcomb*, 521 F.3d at 138; *Varughese v. Mt. Sinai Med. Ctr.*, No. Civ. 8812 (CM)(JCF), 2015 WL 1499618, at *38 (S.D.N.Y. Mar. 27, 2015).

Under the framework, the plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *See Sosa v. Rockland Cty. Comty. Coll.*, 15 Civ. 3329 (JCM), 2017 WL 3105872, at *4 (S.D.N.Y. July 20, 2017). To establish a *prima facie* case, the plaintiff must demonstrate that "(1) he belonged to a protected class; (2) he was qualified for the position that he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Holcomb*, 521 F.3d at 138.

Once the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." *Id.* (quoting *McDonnell Douglas,* 411 U.S. at 802); *see also Reeves*, 530 U.S. at 142 ("This burden is one of production, not persuasion."). If the defendant provides a nondiscriminatory basis for the employment decision, "the burdens shifts back to plaintiff to demonstrate, by a preponderance of the evidence, that the defendant's reasons are merely pretext for discrimination." *Sosa*, 2017 WL 3105872, at *4. "The plaintiff need not prove that the explanation offered by the employer was entirely false 'but only that . . . [the defendant's] stated reason was not the only reason' and that consideration of an impermissible factor 'did make a difference.'" *Phillips v. Dow Jones & Co.,* No. 04 Civ. 5178 (DAB), 2009 WL 2568437, at *9 (S.D.N.Y. Aug. 17, 2009) (quoting *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 105 (2d Cir. 1989)) (alteration in original). Plaintiff will survive summary judgment if it produces "evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole *or in part by* . . . discrimination." *Id.* (emphasis in original).

## 1. Exhaustion of Administrative Remedies

As an initial matter, Defendant contends that Plaintiff's discrimination claim is limited to her 2014 termination on the basis of her race, as it is the only claim raised in Plaintiff's Equal Opportunity Employment Commission ("EEOC") charge. (Def. Br. at 15); *see Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) ("As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC."). However, claims that are "reasonably related" to those stated in the EEOC charge can be addressed in federal court. *See Deravin*, 335 F.3d at 200–201; *see also Fleming v. Verizon N.Y., Inc.*, 419 F. Supp. 2d 455, 462 (S.D.N.Y. 2005). The Second Circuit recognizes three circumstances in which claims are considered "reasonably related" to those raised in an EEOC charge: (1) where the conduct complained of falls within the scope of the expected EEOC investigation into the charge of discrimination; (2) where the complaint alleges retaliation by the employer against the employee for filing an EEOC charge; and (3) where the complaint concerns further incidents of discrimination carried out in "precisely the same manner" as that alleged in the EEOC charge. *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003).

Here, Plaintiff's EEOC charge states:

I believe I was discriminated against on the basis of my Race and National Origin in violation of Title VII of the Civil Rights Act of 1964 . . . when I was terminated from my job. Specifically, on 29 January 2014 I arrived at work but was very sick. My supervisor wanted to reassign me to the Ventilation Unit, which is not my usual assignment and is much more difficult. My supervisor wanted . . . to put a Caucasian nurse in to my assignment for the day; these reassignments happen frequently when Caucasian nurses do not want to work the Ventilation unit, African American nurses are reassigned. Preferential assignments are also made for Haitian nurses. I did not believe I could physically handle the assignment given my health. When I left work to see my doctor, who provided a note indicating I could not return to work until 31 January, I was terminated. Other nurses, Caucasian or not of US origin, are not terminated for being too sick to work.

(Docket No. 28-1). Because the "relatedness" analysis is "intimately connected to the facts asserted in the EEOC complaint," *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 71 (2d Cir. 2006), "and does not depend on the boxes checked or labels applied by the plaintiff," *Carby v. Holder*, No. 11 Civ. 5775(DLC), 2013 WL 3481722, at *5 (S.D.N.Y. July 10, 2013), the Court finds that the charge fairly encompasses Plaintiff's claim that Defendant discriminated against her by reassigning her to work on the Ventilator and Rehabilitation Units, as Plaintiff's EEOC charge makes reference to preferential assignments based on race. *See Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008) ("We frequently invoke the 'reasonably related' doctrine when the factual allegations made in the administrative complaint can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised.").

However, Plaintiff's EEOC charge makes no reference to Defendant's failure to properly pay her for accrued vacation time or Defendant's denial of Plaintiff's overtime hours. In addition, there are absolutely no allegations of unfair or discriminatory time and leave practices in Plaintiff's EEOC charge. Therefore, the Court concludes that Plaintiff's new factual allegations are not "reasonably related," in part because they could not "reasonably be expected to blossom into an investigation covering allegations of unrelated misconduct by [Defendant.]"[13] *Mathirampuzha*, 548 F.3d at 76; *see also Chinn v. City Uni. of N.Y. Sch. of Law at Queens Coll.*, 963 F. Supp. 218, 223 (E.D.N.Y. 1997) ("Discriminatory conduct or factual predicates alleged

---

[13] Even if these claims were reasonably related, Plaintiff's claims would be dismissd. Assuming, without deciding, that these actions would be considered adverse employment actions and that they were motivated by discriminatory intent for purposes of a *prima facie* case, Plaintiff could not show that Defendant's proffered reasons for these actions were pretextal. Defendant explains that: (1) "any error in the amount of vacation and sick leave benefits was implemented on a bargaining unit wide basis impacting all races and could not have been discriminatory"; and (2) "Northern Manor used per-diem LPNs to cover for hours that would be considered overtime" because it was less costly. (Def. Br. at 27). Plaintiff points to no colorable evidence that would undermine Defendant's reasoning. Indeed, as Defendant notes, Plaintiff does not even address Defendant's reasoning in her Opposition. (Def. Reply at 13 n.3).

for the first time in the complaint are barred if they fall outside of the reasonable scope of the

EEOC inquiry.").

Accordingly, the Court will only address Plaintiff's discrimination claims on the basis of

race[14] stemming from her 2014 termination and reassignments to the Ventilator and

Rehabilitation Units.

## 2.  Plaintiff's 2014 Termination

Plaintiff alleges that Defendant's decision to terminate her in 2014 constituted

discrimination on the basis of her race. (Docket No. 1).  Defendant, however, argues that

Plaintiff cannot establish a *prima facie* case of discrimination under Title VII. (Def. Br. at 18–

20).  Moreover, Defendant argues that even if Plaintiff could make out a *prima facie* case, her

claim still fails because she has not put forth sufficient facts to give rise to an inference that

Northern Manor's nondiscriminatory reasons for terminating her were a pretext for race-based

discrimination. (*Id.* at 20–23).  For the reasons that follow, the Court concludes that Plaintiff has

narrowly made out a *prima facie* case.  However, the Court finds that Plaintiff has failed to put

forth evidence that demonstrates that Northern Manor's proffered reason for terminating her was

merely a pretext for discrimination.

## a.  *Prima Facie* Case

Defendant does not dispute that Plaintiff has made out the first three elements of a *prima*

*facie* case, as Plaintiff is African-American, was qualified for her position as an LPN, and her

2014 termination clearly constitutes an adverse employment action. *See, e.g.*, *Philip v. Gtech*

---

[14] Though Plaintiff raises a claim for discrimination on the basis of her national origin in her EEOC charge and seems to attempt to do so in her Opposition, the Court will not consider it here.  As Defendant correctly notes, Plaintiff does not put forth a claim for discrimination on the basis of her national origin in the complaint she filed in federal court. (Def. Br. at 17; Docket No. 1).  Accordingly, the Court finds that Plaintiff has not plead a claim for national origin discrimination.

*Corp.*, 14 Civ. 9261 (PAE), 2016 WL 3959729, at *13 (S.D.N.Y. July 20, 2016) (describing termination of employment as the "paradigmatic adverse employment action"). Defendant argues, however, that Plaintiff cannot show that her 2014 termination was motivated by discriminatory intent on the basis of her race.

Factors contributing to an inference of discriminatory intent may include: (1) "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position"; (2) "criticism of the plaintiff's performance in ethnically degrading terms"; (3) "invidious comments about others in the employee's protected group"; (4) "the more favorable treatment of employees not in the protected group"; or (5) "the sequence of events leading to the plaintiff's discharge." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal citations omitted). The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb*, 521 F.3d at 137. Thus, "affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Still, conclusory allegations of discrimination are insufficient to prove discriminatory intent. *See Holcomb*, 521 F.3d at 137; *see also Mines v. City of New York/DHS*, No. 11 Civ. 7886 (JGK), 2013 WL 5904067, at *6 (S.D.N.Y. Nov. 4, 2013).

Plaintiff offers the following evidence to support an inference of discrimination with regard to her 2014 termination: (1) statistical analysis[15] that purports to show that African-

---

[15] Defendant initially offered data along with its motion in support of its claim that Northern Manor did not disproportionately assign African-American LPNs to the Ventilator and Rehabilitation Units. (Docket No. 24 at 13). Plaintiff responded by offering a "critical analysis" of Defendant's data and additional "more comprehensive" data.

American LPNs worked a disproportionate number of Ventilator Unit and Rehabilitation Unit shifts as compared to Caucasian LPNs; and (2) the sworn affidavits of two former supervisors who claim to have observed racial bias. (Pl. Opp. at 6–10). Though Plaintiff's data does not support an inference of race-based discrimination, the Court finds that Plaintiff has narrowly satisfied her "minimal" burden of establishing a *prima facie* case on the basis of the sworn affidavits alone. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

### i. The Statistical Analysis

"A plaintiff may . . . present statistical findings as circumstantial evidence of intentional discrimination," *Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir. 1999), but "the statistical evidence must be sufficient to create an inference of discrimination," *Duggan v. Local 638, Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach., Air Conditioning and Gen. Pipefitters*, 419 F. Supp. 2d 484, 491 (S.D.N.Y. 2005); *Wright v. Stern*, 450 F. Supp. 2d 335, 363 (S.D.N.Y. 2006) ("For statistics to give rise to an inference of discrimination, they must be statistically significant, for disparity among protected and unprotected groups will sometimes result by chance."); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977) ("[Statistics] come in infinite variety and . . . their usefulness depends on all of the surrounding facts and circumstances.").

Though Plaintiff and Defendant disagree on the proper analysis of the underlying numbers, the numbers themselves are not meaningfully in dispute. Plaintiff and Defendant agree that:

- From May 20, 2013 to January 29, 2014, six Caucasian LPNs worked 265 shifts in the Ventilator Unit (55% of the total 483 shifts) and six African-American LPNs worked 218 shifts (45% of the total 483 shifts). (Docket No. 28-21 at 7; Docket No. 29-7 at 1; Def. Reply at 7).

(Pl. Opp. at 7–11). Plaintiff maintains that its data refutes Defendant's arguments and "provide[s] significant objective evidence of a discriminatory basis for the actions of the [D]efendant." (*Id.* at 11).

- After excluding African-American LPN Stephanie Wellington ("Wellington")—who chose to work on the Ventilator Unit as opposed to being *assigned* by Northern Manor—the number of shifts covered by African-Americans drops to 81 (23% of 346 total shifts) and the percentage of shifts assigned to Caucasian LPNs rises to 77%.[16] (Def. Br. at 19; Pl. Opp. at 8; Def. Reply at 7).

Plaintiff asserts, however, that these statistics are misleading because they do not account for the total number of LPNs of each race. (Pl. Opp. at 7). In other words, Plaintiff contends that the above numbers merely demonstrate that African-American LPNs worked fewer shifts than Caucasian LPNs overall, but do not shed light on whether Northern Manor *disproportionately* assigned African-Americans to the Ventilator Unit. Thus, Plaintiff calls for a pro-rata analysis.

Even assuming that Plaintiff is correct, a pro-rata analysis does not support a *prima facie* case of race-based discrimination. To begin with, neither party provided the Court with accurate ratios for comparison and the Court was left "laboring in an alien and unfamiliar terrain" with "incomplete [and] erroneous data[.]"[17] *Waisome v. Port Auth. of New York & New Jersey*, 948 F.2d 1370, 1372 (2d Cir. 1991). Plaintiff's analysis only accounts for Caucasian and African-

---

[16] Plaintiff claims that the shifts worked by two Caucasian LPNs, LPN Mancini and LPN Coates, should be excluded from the total number of shifts worked by Caucasian LPNs because Mancini and Coates *requested* to work on the Ventilator Unit. (Pl. Opp. at 8). This claim was based upon the Affidavit of CNA Ethel Remy, who "believe[d]" Mancini and Coates requested to work that unit. (Remy Aff. at ¶ 6). Defendant, however, provided affidavits from Mancini and Coates, both of whom indicated that they did not request to work on the Ventilator Unit. (Mancini Aff. at ¶¶ 2–7; Coates Aff. at ¶¶ 3–7). Given that Remy's affidavit is based upon information and belief and that Mancini's and Coates' affidavits are based upon direct personal knowledge, the Court does not credit Remy's affidavit in relation to this issue. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit . . . used to support or oppose a motion [for summary judgment] must be made on personal knowledge . . ."); *Patterson v. Cty of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("The Rule's requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'"). Thus, for purposes of this motion, it is undisputed that LPN Mancini and LPN Coates did not request to work on the Ventilator Unit.

[17] Though parties often engage in "'the well-known phenomenon of statistical dueling between . . . highly-paid experts,'" *Wright*, 450 F. Supp. 2d at 364 (internal quotation marks omitted), neither party utilized an expert here. Of course, experts are not required when the statistical analysis is "simple," *Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 877 (2d Cir. 1997), but district courts in the Second Circuit "commonly" reject statistical evidence in disparate treatment cases where that evidence requires a more complicated analysis. *Singh v. Bay Crane Service Inc.*, No. 11 Civ. 720(RJD)(RER), 2015 WL 918678, at *3 (E.D.N.Y. Mar. 3, 2015) (listing cases). The Court notes that an expert's analysis might have been useful here, but takes issue with the statistical analysis on other grounds.

American LPNs. (Docket No. 29-7 at 1; Scott Aff. at ¶ 12). This analysis is erroneous for two reasons: (1) it includes Wellington, who requested to work on the Ventilator Unit, (Scott Aff. at 11), and the appropriate analysis only involves the pool of LPNs who did not request to work on the Ventilator Unit;[18] and (2) it fails to account for LPNs at Northern Manor of other races (eleven Haitians,[19] one Jamaican, one Filipino, and one Indian). As a result, the total pool for the analysis should consist of thirty-five LPNs and of those, 40% were Caucasian (fourteen out of thirty-five); 20% were African-American (seven out of thirty-five); 31% were Haitian (eleven out of thirty-five); and 9% were of other races (three out of thirty-five). Using these ratios, the Court fails to see how the data supports Plaintiff's claims. African-American LPNs worked 23% of Ventilator Unit shifts and constituted 20% of all LPNs who did not request to work on that unit, whereas everyone outside of Plaintiff's protected class (Caucasians, Haitians, and all others), worked 77% of the shifts and constituted 80% of all LPNs who did not request to work on the Ventilator Unit. That African-American LPNs worked on the Ventilator Unit slightly more than they would have in a perfectly proportional world is not sufficient to create an inference of discrimination.[20]

---

[18] The Court finds it unpersuasive to compare the percentage of Ventilator shifts worked by *all* African-Americans – including those who requested that unit – to the percentage of African American LPNs employed during the relevant period. An analysis that includes Wellington demonstrates that African-Americans worked 45% of the total shifts and constituted 20% of LPNs at Northern Manor during the relevant period. (Docket No. 29-7 at 1). This might lead one to conclude that African-American LPNs worked more shifts than they would have if the assignments were perfectly proportional. However, Wellington's shifts accounted for 137 of the 218 total shifts worked by African-American LPNs (nearly 63%). The fact that Defendant granted Wellington's requests to work on the Ventilator Unit should not be used against them.

[19] Plaintiff inaccurately states that there were twelve Haitian LPNs at Northern Manor during the relevant period. (Scott Aff. at ¶ 12). However, a review of the Exhibit to Scott's Affidavit indicates that there are only eleven Haitian LPNs. (Scott Aff. at 11).

[20] Plaintiff's statistical analysis of the Rehabilitation Unit assignments also fails. African-American LPNs were assigned to work 31% of the total Rehabilitation shifts, (Def. Reply at 7), and constituted 20% of the LPNs at Northern Manor during the relevant period, whereas all others constituted 80% and worked 69% of the shifts. Though these numbers are not perfectly proportional, the Court finds it unlikely that a reasonable juror would find the disparity to be significant. Regardless, the data lacks probative value for the reasons outlined in what follows.

Moreover, when comparing Plaintiff directly to other employees outside of her protected class, the data does not evidence that she was treated less favorably. Indeed, the data indicates that during the relevant time period Plaintiff actually worked less Ventilator Unit shifts than two Caucasian LPNs who did not request that unit. According to Plaintiff, she was assigned to work on the Ventilator Unit forty times during the relevant period. (Docket No. 29-9). However, Caucasian LPN Coates worked 146 Ventilator shifts and Caucasian LPN Mancini worked forty-eight. (Def. Reply at 8). Plaintiff also claims that there is something to be gleaned from the fact that she was assigned to the Ventilator Unit more often after she signed the Last Chance Agreement. (Pl. Opp. at 9). Nevertheless, the Court fails to see how this fact evidences race-based discrimination.[21]

Regardless, the Court finds that the statistics fail to support an inference of discrimination because Plaintiff "assumes that any anomalies in the . . . data must be caused by [race-based] discrimination, and makes no attempt to account for other possible causes." *Raskin v. Wyatt Co.*, 125 F.3d 55, 68 (2d Cir. 1997); *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999) (upholding the district court's summary judgment finding that plaintiff's statistical evidence had no probative value as to the issue of race or sex discrimination because the analysis failed to control for nondiscriminatory causes). For example, Plaintiff arrives at her conclusion that the assignment system evidences racial bias without accounting for the fact that some of the LPNs in the data-set are floaters, who receive daily assignments based on the needs of the facility. Nor

---

[21] To the extent that Plaintiff claims her increased assignment was retaliatory in response to her entering into the Last Chance Agreement, her claim fails under Title VII. To establish a *prima facie* case of retaliation under Title VII, an employee must show that: (1) she was engaged in a protected activity; (2) defendant was aware of the protected activity; (3) she suffered a materially adverse action; and (4) there is a causal connection between her protected activity and the materially adverse action. *See, e.g., Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012). Entering into a last chance agreement approved by a union is not a "protected activity" for purposes of a Title VII retaliation claim. *Id.* ("[T]he Second Circuit has recognized that 'protected activity' includes 'informal protests of discriminatory employment practices, including making complaints to management'").

does Plaintiff attempt to account for the impact that an LPN's seniority, performance, or qualifications may have had on the assignment system. *See Drake v. Delta Air Lines, Inc.*, No. 94 Civ. 5944(FB) (RML), 2005 WL 1743816, at *8 (E.D.N.Y. July 21, 2005) ("Statistical evidence must adequately address the relevant statistical comparison and must account for other possible causes of the disparity."); *Guider v. F.W. Woolworth Corp.*, No. 96 Civ. 3168 (LAP), 1998 WL 702275, at *11 (S.D.N.Y. Oct. 7, 1998); *see also Quarles v. Bronx-Lebanon Hosp. Center*, 228 F. Supp. 2d 377, 384 (S.D.N.Y. 2002) (finding that "unanalyzed lists of the salaries of other . . . employees . . . without accounting for differences in education, seniority, performance, or specific work duties" did not establish that plaintiff was similarly situated to the comparators he claimed received larger salary increases).

"The Second Circuit has repeatedly held that statistical evidence purporting to show the effects of discrimination is not probative of an employer's intent where no effort is made to account for possible causes of the disparity." *Fahmy v. Duane Reade, Inc.*, No. 04 Civ. 1798(DLC), 2006 WL 1582084, at *7 (S.D.N.Y. June 9, 2006); *Bonton v. City of New York*, No. 03 Civ. 2833(SAS), 2004 WL 2453603, at *4 (S.D.N.Y. Nov. 3, 2004). Without "contextual information," a rational jury could not draw any inference regarding race-based discrimination from the "minimal data" Plaintiff presents. *LaMarch v. Tishman Speyer Prop., L.P.*, No. 03 Civ. 5246(CBA), 2006 WL 2265086, at *6 (E.D.N.Y. Aug. 8, 2006). Thus, no matter how the data is construed, Plaintiff's "statistical evidence does not make it more or less likely that [Defendant] discriminated against [her] because of her race," and the Court declines to find that the statistical analysis has probative value.[22] *Bickerstaff*, 196 F.3d at 450.

---

[22] "[Q]uestions of admissibility are properly resolved by the court" on summary judgment. *Raskin*, 125 F.3d at 66 (internal citation omitted).

### ii. Plaintiff's Remaining Evidence

Plaintiff also points to the affidavit of Debra Toms ("Toms"), a supervising nurse who worked with Plaintiff from 2004 through 2009 to support her claim of discrimination. (Pl. Opp. at 6; Toms Aff.[23] at 2). According to Toms, LPN Ball or LPN Chiavoni told her to, "[w]atch out for Bridget, she is a member of the NAACP." (Toms Aff. at 2). While comments reflective of racial bias can supply evidence of discriminatory intent, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Tomassi v. Insignia Fin. Grp., Inc.,* 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.* 557 U.S. 167 (2009). Here, it is not clear that the remark – a warning about Plaintiff because of her membership in an organization that works to eliminate race-based discrimination – evinces a discriminatory state of mind. *See Tolbert v. Smith*, 790 F.3d 427, 437 (2d Cir. 2015) (finding the following remark to "clearly suggest racial bias": "Do you only know how to cook black, or can you cook American too?"); *Vaughn v. Empire City Casino at Yonkers Raceway,* No. 14 Civ. 10297 (KMK), 2017 WL 3017503, at *16–17 (S.D.N.Y. July 14, 2017) (finding comments such as, "be a good little black monkey and start moving faster to your machine," to be "blatantly racist" and demonstrative of discriminatory animus); *Philip*, 2016 WL 3959729, at *14 (finding that the repeated use of the term "nigger" was "so beyond the pale that its repeated use as an insult in reference to African-American employees clearly can support an inference of discrimination"). Furthermore, there is a significant temporal gap between when this comment was made in 2004, (*see* Toms Aff. at 1–2), and Plaintiff's 2014 termination. In the absence of evidence of other derogatory or racists comments in the ten years that followed the initial

---

[23] Refers to the affidavit of former Northern Manor employee Debra Toms. (Docket No. 31).

remark, the Court finds it highly unlikely that a reasonable juror could draw the inference that Plaintiff's termination was motivated by discriminatory intent. *See Tomassi*, 478 F.3d at 115 ("The more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.").

Nevertheless, viewed together with other statements in the sworn affidavit of Ethel Remy, a long-time CNA at Northern Manner, the Court finds that the evidence is sufficient, albeit marginally, to permit the inference of discrimination required to make out the fourth element of a *prima facie* case. Remy states "that a disproportionate number of African-American LPNs" were assigned to the Ventilator and Rehabilitation Units. (Remy Aff.[24] at ¶ 4). According to Remy, "[s]everal of the White LPNs who were regularly assigned to a Continuous Care or a regular unit were never assigned to the Vent unit."[25] (*Id.* at ¶ 5) (listing the names of five Caucasian LPNs). Similarly, Remy stated that she has observed "harsher discipline imposed on African American nurses" and that in her fifty years at Northern Manor, she has never seen an African-American nurse made a nurse manager. (*Id.* at ¶ 1). These statements are far from conclusive as to whether Plaintiff's termination was discriminatory. In addition, portions of the affidavits are merely conclusory. (*See, e.g.*, *id.* at ¶ 7) ("[Plaintiff was] always asked for a note when she was ill, which was not the case for all LPNs, particularly the White LPNs."). However, for the limited purpose of establishing a *prima facie* case, these statements, viewed

---

[24] Refers to the affidavit of Ethel Remy. (Docket No. 32).

[25] Toms also recalled "that the African-American LPNs were assigned to the Ventilator and Rehabilitation Units more frequently than the white LPNs." (Toms. Aff. at 2). In contrast to Remy's affidavit, however, Toms' affidavit lacks any "concrete particulars;" Toms' statement is therefore a "bald assertion" insufficient to satisfy Federal Rule of Civil Procedure 56(e). *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (finding that the district court properly refused to rely on conclusory allegations of racism at the summary judgment stage). Thus, the Court disregards Toms' statement. *See Wahad v. F.B.I.*, 179 F.R.D. 429, 435–44 (S.D.N.Y. 1998).

together and in the light most favorable to the non-moving party, are sufficient to satisfy the minimal requirements of a *prima facie* case.

### b. Northern Manor's Non-Discriminatory Reason for Termination

Because Plaintiff has made out a *prima facie* case of discrimination, the burden shifts to Defendant to produce evidence that Plaintiff was terminated for a legitimate, nondiscriminatory reason. The Court finds that Defendant has done so. Defendant states that Plaintiff was terminated for violating the terms of the Last Chance Agreement. (Def. Br. at 20). Pursuant to the LCA, failure to accept an assignment and insubordination were grounds for discharge. (*Id.*). Defendant argues that Plaintiff violated the LCA "by refusing to work on the Ventilator Unit on January 29, 2014[.]" (Def. Reply at 10).

Plaintiff, however, contends that she never violated the LCA. (Pl. Opp. at 6). According to Plaintiff, she left work due to a medical condition and later provided a doctor's note. (Pl. Opp. at 13). While Plaintiff disputes that she "refused" her assignment, both sides agree that Plaintiff left work on a day she was assigned to the Ventilator Unit. (Def. Statement at ¶¶ 43–45; Pl. Counterstatement at ¶¶ 43–44; Scott Aff. at ¶ 28). Whether she left because of a medical condition or "refused" her assignment is immaterial because Defendant has put forth undisputed evidence of Plaintiff's insubordination. According to the written statements of two Northern Manor employees, Plaintiff "became further argumentative" and "started screaming and swearing" after she was made aware of her reassignment to the Ventilator Unit.[26] (*See* Docket

---

[26] Defendant's Statement cites to the written statements of various nurses regarding Plaintiff's behavior on January 29, 2014 in support of the proposition that "Plaintiff raised her voice, became argumentative, and swore at Ball." (Def. Statement at ¶ 89; Docket No. 28-13). Plaintiff "disputes" this on the grounds that, "The statement attributed to Nurse Ball is not contained in [Nurse Ball's] statement." (Pl. Counterstatement at ¶ 89). However, Defendant does not cite directly to Ball's written statement for support; rather, Defendant cites generally to Exhibit L, which consists of the written statements of three Northern Manor nurses, and to Exhibit M, Plaintiff's Employee Disciplinary Notice. (*See* Def. Statement at ¶ 89; Docket Nos. 28-13, 28-14). When read together, the various written statements explicitly show that Plaintiff became "further argumentative," (Docket No. 28-13 at 1), and was "screaming and swearing," (Docket No. 28-13 at 2). Because Plaintiff's Counterstatement does not identify "an

No. 28-13). It is also undisputed that before leaving, Plaintiff said, "[A]ll they do is hire stupid lazy nurses around here and I am going home." (Def. Statement at ¶ 93; Pl. Counterstatement at ¶ 93). Thus, Plaintiff's contention that Defendant needed to reconsider her termination after she provided a doctor's note is misguided. A doctor's note may have excused an absence pursuant to Northern Manor's policies, but it would not excuse her insubordination and unprofessional conduct. "[W]hile it is possible to dispute whether . . . Plaintiff's [conduct] . . . really justified [her termination], to do so would require a court to 'sit as a super–personnel department' to reexamine whether an employee's [conduct] was really deficient, something that we have stated courts should not do." *Ghent v. Moore*, 324 F. App'x 55, 57 (2d Cir. 2009).

Furthermore, the analysis in *Varughese v. Mount Sinai Medical Center*, a case brought under the same state and federal antidiscrimination laws at issue here, is instructive. No. Civ. 8812 (CM)(JCF), 2015 WL 1499618 (S.D.N.Y. Mar. 27, 2015). There, the defendants received multiple reports that plaintiff was disruptive and insubordinate. *Id.* at *47. Though plaintiff disagreed that her conduct was worthy of complaint, she did "not raise any genuine issue about whether complaints were in fact made." *Id.* The court found that even if the complaints were unfounded, defendants' receipt of the complaints of plaintiff's insubordination was a legitimate and nondiscriminatory reason for adverse employment actions against her. *Id.*; *see also Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 459 (S.D.N.Y. 2012), *aff'd sub nom. Nolley v. Swiss Reinsurance Am. Holding Corp.*, 523 F. App'x 53 (2d Cir. 2013).

As in *Varughese*, Defendant received reports that Plaintiff had left work after learning that she was assigned to the Ventilator Unit and arguing with her supervisor. This behavior was similar – if not nearly identical – to the behavior that resulted in the LCA. The LCA made it

---

actual factual inconsistency," the Court treats the statement as undisputed. *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 408 n.1 (S.D.N.Y. 2017).

very clear that if Plaintiff engaged in this behavior again, she would be terminated. (*See* Docket

No. 28-10) ("Bridget Scott acknowledges that should she in the future commit *any* infraction

*similar* to which she was discharged for committing . . . it shall be grounds for discharge."

(emphasis added)).  The receipt of this information regarding Plaintiff's conduct and

insubordination, even if unfounded, is enough to satisfy Defendant's burden at the second stage

of the *McDonnell Douglas* analysis. *See Varughese*, 2015 WL 1499618, at *47.  Therefore, the

Court finds Defendant's reasons for terminating Plaintiff legitimate and non-discriminatory.

### c.  Evidence of Pretext

Plaintiff fails to put forth sufficient evidence to demonstrate that Northern Manor's

proffered reasons for her termination were a pretext for race discrimination.  As noted, Plaintiff

has the ultimate burden "to point to evidence that reasonably supports a finding of prohibited

discrimination . . ." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013); *St.

Mary's Honor Ctr.*, 509 U.S. at 519 ("It is not enough . . . to *dis* believe the employer; the

factfinder must *believe* the plaintiff's explanation of intentional discrimination.").  Thus, to avoid

summary judgment, "the plaintiff is not required to show that the employer's proffered reasons

were false or played no role in the employment decision, but only that they were not the only

reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521

F.3d 130, 138 (2d Cir. 2008) (internal quotation marks omitted).

Given that the Court already determined that the data as presented does not support an

inference of discrimination,[27] the only remaining evidence in support of Plaintiff's claims are the

---

[27] Even if the statistical evidence were probative, it would not establish pretext given the lack of additional evidence in the record. "While statistical evidence may sometimes enable a plaintiff to carry its modest burden of creating a prima facie case . . ., the Court is aware of no case where generalized statistical evidence has been held sufficient to refute, for summary judgment purposes, a defendant's particularized evidentiary showing of a nondiscriminatory explanation for a particular act complained of, in the absence of any other material, admissible evidence of discrimination." *Robinson v. Metro-North Commuter R.R. Co.*, 1998 WL 17742, at *9 (S.D.N.Y. Jan. 16, 1998); *Martin v. Citibank, N.A.*, 762 F.2d 212, 218 (2d Cir. 1985) ("[T]he statistical proof is not sufficient to carry the case

affidavits of Toms and Remy. Nevertheless, Toms' and Remy's statements, some of which are remote in time and many of which are merely conclusory, are insufficient to prove that Northern Manor's decision to terminate Plaintiff was even partially motivated by racial bias. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). First, Toms' affidavit contains merely one statement suggestive of racial bias: that she was told by one of the nurse managers to watch out for Plaintiff because of her NAACP membership. (Toms Aff. at 2). As previously noted, this remark was made a decade before Plaintiff's termination and is unrelated to the decision-making process at issue here; therefore, it is "too remote and oblique" to establish pretext. *See Tomassi*, 478 F.3d at 115; *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 150 (2d Cir. 2010) (finding discriminatory remark made "years before most of the events at issue" and "unrelated to the decision making process" had "little probative value"); *see also Spratt v. Verizon Commc'ns Inc.*, No. 11. Civ. 273 (AJN), 2014 WL 4704705, at *8 (S.D.N.Y. Sept. 17, 2014) (finding a supervisor's racist comments about plaintiff "troubling," but declining to find that the remarks demonstrated that plaintiff was fired because of his race as the remarks were made one-and-a-half years prior to plaintiff's termination and were unrelated to the decision-making process). The Court finds no other evidence in Toms' affidavit that would establish that Northern Manor terminated Plaintiff at least in part because of her race.

Nor can Plaintiff withstand summary judgment on the basis of Remy's affidavit. Though Remy provide the names of five Caucasian LPNs who she states were assigned to a regular unit,

to the jury in itself . . . "); *Hudson v. Intern'l Bus. Machines Corp.*, 620 F.2d 351, 355 (2d Cir. 1980) (finding that statistics, standing alone, cannot stablish that a particular employee has been discriminated against because of his race in a disparate treatment action).

but never had to cover the Ventilator Unit, (Remy Aff. at ¶ 5), her affidavit is otherwise "devoid of 'concrete particulars'" and therefore does not "suffice to avoid summary judgment," *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  That five Caucasian LPNs were never assigned to the Ventilator Unit does not "create an issue of fact as to the existence of discriminatory animus," *Watson v. Geithner*, No. 09 Civ. 6624(HBP), 2013 WL 5420932, at *11 (S.D.N.Y. Sept. 27, 2013). Plaintiff seems to "rely on the fallacy that because she belongs to a protected class, it is plausible that anything negative that happened to her at work was because of her membership in that class." *Watkins v. First Student, Inc.*, No. 17 Civ. 1519 (CS), 2018 WL 1135480, at *15 (S.D.N.Y. Feb. 28, 2018); *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has 'done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race.'" (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001))).

Furthermore, even if the Court were to assume that Defendant's explanation for Plaintiff's termination could be found by a jury to be pretextual, Plaintiff's *prima facie* case, without more, would be insufficient to survive summary judgment. *See James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) ("[A] prima facie case, combined with falsity of the employer's explanation, will not [always] be sufficient…").  Merely "contradicting the employer's given reason – without more – does not necessarily give logical support to an inference of discrimination." *Id.* at 154.

Thus, Plaintiff has failed to present plausible evidence suggesting that the legitimate, nondiscriminatory reasons advanced by Northern Manor for Plaintiff's termination were a

pretext for discrimination. Moreover, Plaintiff has not set forth "sufficient evidence in the record to create an issue of fact as to the existence of discriminatory animus." *Watson*, 2013 WL 5420932, at \*11. Accordingly, Defendant's motion for summary judgment as to Plaintiff's discrimination claim relating to her termination under Title VII, § 1981, and the NYSHRL is granted.

### 3. Reassignment to the Ventilator and Rehabilitation Units

Plaintiff also alleges that her frequent reassignment to the Ventilator and Rehabilitation Units constituted discrimination on the basis of her race. As previously discussed, Plaintiff has satisfied the first two elements of a *prima facie* case because she is African-American and there is no dispute that she was qualified for her position. However, Plaintiff cannot establish the third element of a *prima facie* case: that her reassignment to the Ventilator Unit constitutes an adverse employment action.

"A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2014) (internal quotation marks omitted). However, a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to be materially adverse. *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). The Second Circuit has held that "a transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000); *see also Ifill v. United Parcel Serv.,* No. 04 Civ. 5963 LTSDFE, 2005 WL 736151, at \*5 (S.D.N.Y. Mar. 29, 2005) ("[A] lateral transfer, even if imposed on an employee involuntarily, does not constitute an adverse employment action unless it is

accompanied by some other material adverse change in conditions, such as a reduction in pay or status."); *Pimentel v. City of New York*, No. 00 Civ. 326(SAS), 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) ("If an employee 'earns the same salary, has the same benefits, works the same hours . . . and has the same opportunities for promotion' following a transfer then there is no adverse employment action, even if the employee is 'extremely unhappy about it.'" (quoting *Garber v. N.Y.C. Police Dep't*, No. 95 Civ. 2516 (JFK), 1997 WL 525396, at *4 (S.D.N.Y. Aug. 22, 1997))). Because Plaintiff has not alleged that her reassignment was accompanied by any other adverse change, it does not amount to an adverse employment action. Moreover, the reassignment was temporary – lasting only a day each time Plaintiff was reassigned – and based on the needs of the facility. Consequently, it does not constitute an adverse employment action.

As such, Defendant's motion for summary judgment as to Plaintiff's discrimination claims relating to reassignment under Title VII, § 1981, and NYSRL is granted.

## B. Retaliation in Violation of New York Labor Law § 741

Plaintiff also brings a claim under the New York State whistleblower statute, NYLL § 740 & 741. Generally, "[t]he traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial, as is the case here. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)); *see also Holmes v. Astor Services for Children & Families,* 16 Civ. 2260 (CS), 17 WL 3535296, at *8 (S.D.N.Y. Aug. 16, 2017).

Nevertheless, Plaintiff does not oppose Defendant's motion with respect to her NYLL § 741 claim. (*See* Def. Reply at 5). Thus, the Court finds that it would be inimical to the interest of

judicial economy to decline to rule on Plaintiff's NYLL § 741 claim at this juncture, particularly given that discovery is already complete. *See Winter v. Northrup*, 334 F. App'x 344, 345–46 (2d Cir. 2009). Accordingly, the Court grants Defendant's motion with respect to Plaintiff's NYLL § 741 claim. *See, e.g.*, *Sterlin v. City of New York*, 11 Civ. 0715 (JPO), 2014 WL 2560595, at *4 (S.D.N.Y. June 6, 2014) (granting summary judgment in favor of movant on unopposed claims); *Stevens v. City of New York*, No. 10 Civ. 2172 KBFJLC, 2012 WL 3000677, at *3 (S.D.N.Y. July 17, 2012) (same).

**C. New York Labor Law Wage and Overtime Claims**

In Plaintiff's Opposition, she seeks permission, for the first time, to assert claims under NYLL for her accrued vacation time and denial of overtime. The Court notes that Plaintiff does not specify which section of the NYLL these claims would be brought under, nor were any such claims explicitly raised in her Complaint. "A party is not entitled to amend [their] complaint through [their] memoranda," *Butvin v. DoubleClick Inc.*, No. 99 Civ. 4727(JFK), 2000 WL 827673, at *13 (S.D.N.Y. June 26, 2000), and therefore the Court declines to consider these claims on this basis alone. *See, e.g., Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 764 n.4 (S.D.N.Y. 2006) ("The complaint makes no mention of these claims and plaintiffs cannot amend their complaint through a legal memorandum."); *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 318 n.9 (S.D.N.Y. 2003) ("Absent the filing of an amended complaint that properly pleads the components of [the asserted claim], the Court will not consider this allegation.").

**IV. CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is granted. The

Clerk of Court is respectfully requested to terminate the pending motion, (Docket No. 24), and close the case.

Dated:   March 30, 2018
         White Plains, New York

                         **SO ORDERED:**

                         _____
                         JUDITH C. McCARTHY
                         United States Magistrate Judge